UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

John Gilmore Sampson, *et al.*,

      Plaintiffs,

v.                                                                Case No. 13-10113

Blue Cross Blue Shield of Michigan, *et al.*,      Sean F. Cox
                                                                  United States District Court Judge
      Defendants.

_____/

**OPINION & ORDER DENYING**
**BCBS DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff John Sampson is a physician who had contracts with Blue Cross Blue Shield of

Michigan ("BCBS") under which he provided medical services for patients, in exchange for

reimbursement. Dr. Sampson, his wife, and business entities that they have interests in, filed this

§ 1983 suit against multiple Defendants, including BCBS and several of its employees, after

those employees aided law enforcement officers in executing search warrants at Dr. Sampson's

home and office.

This case, which has a long and complex history, is currently before the Court on the

BCBS Defendants' Motion for Judgment on the Pleadings. In this motion, the BCBS Defendants

assert that: 1) although they are private citizens, they should be allowed to invoke the defense of

qualified immunity in this action; and 2) they are entitled to qualified immunity as to the claims

asserted against them. The motion has been fully briefed and the Court heard oral argument on

February 13, 2014. The threshold inquiry, whether the BCBS Defendants can assert the defense

of qualified immunity, is an interesting and unusual issue. For the reasons set forth below, the

1

Court shall DENY this motion because the Court concludes that the BCBS Defendants may not invoke the defense of qualified immunity in this action.

**BACKGROUND**

**A.      Procedural Background**

Plaintiffs John Gilmore Sampson, M.D. and Cecelia Sampson, Argyle Plastic and Reconstructive Surgery, P.C. ("Argyle"), Fourth Street Properties, LLC ("Fourth Street Properties"), and John Sampson, M.D., Trustee/Fiduciary of the Argyle Plastic and Reconstructive Surgery, P.C. 401(k) Profit Sharing Plan and Trust ("the Trust") filed this action in federal court on January 11, 2013, based on federal-question jurisdiction.

Plaintiffs' original Complaint named numerous Defendants and asserted the following claims: "42 USC 1983 Deprivation of Rights Under Fourth, Fifth And Fourteenth Amendments Due To Seizure Of Monies Without Probable Cause" (Count I); "Deprivation Of Rights Under Fourth, Fifth And Fourteenth Amendment Due To Seizure Of LLC Funds" (Count II); "42 USC 1983 Conspiracy To Deprive Of Rights Guaranteed By Fourth, Fifth And Fourteenth Amendments" (Count III); "42 USC 1985 Conspiracy To Deprive Of Equal Protection, Privileges And Immunities" (Count IV); "42 USC 1983 Deprivation Of Rights Under Fourth Amendment Due To BCBS Participation In Execution Of Warrant" (Count V); "42 USC Failure To Train/Supervisory Liability" (Count VI); "42 USC Abuse of Process (BCBSM)" (Count VII); "Abuse Of Process (Common Law)" (Count VIII); "Attorney Fees And Costs Under MCL 750.159a" (Count IX); "Invasion Of Privacy" (Count X); "Intentional Infliction Of Emotional Distress Dr. And Mrs. Sampson" (Count XI); "Breach Of Contract" (Count XII); "Interference With Business Relations And Contract" (Count XIII); "Promissory Estoppel" (Count XIV);

2

"Concert Of Action" (Count XV); "Common Law Conspiracy" (Count XVI); and "Respondeat Superior" (Count XVII).

On January 22, 2013, this Court issued an "Order Declining To Exercise Supplemental Jurisdiction Over State-Law Claims" (Docket Entry No. 3) and dismissed the following counts without prejudice: Counts VIII, IX, X, XI, XII, XIII, XIV, XV, XVI, and XVII.  That left Counts I through VII remaining.

This Court issued the Scheduling Order on July 25, 2013.  (Docket Entry No. 18).  That order provides, among other things, that discovery is to close on March 31, 2014, and the deadline for filing motions is May 2, 2014.

On September 20, 2013, Plaintiff filed an Amended Complaint (Docket Entry No. 19). Plaintiffs' Amended Complaint names the following Defendants: 1) BCBS; 2) Detective Sergeant Lisa Gee-Cram ("Cram"); 3) Detective Robert Schrock ("Schrock"); 4) Detective Timothy Schlundt; 5) Detective Lee Rose ("Rose"); 6) Detective Sergeant Brian Russell ("Russell"); 7) Trooper Gina Gettel ("Gettel"); 8) Blackman Township Public Safety Department; 9) Jackson County Sheriff Department; 10) the Jackson County Prosecutor's Office; 11) David Castelein ("Castelein"); 12) John Southworth ("Southworth"); 13) Nina Burnette ("Burnette"); 14) Patricia Hammerle ("Hammerle"); 15) Thomas Clickner ("Clickner"); 16) Susan Post ("Post"); 17) Roger Ramirez ("Ramirez"), and 18) Larry Harrison ("Harrison").  The Amended Complaint asserts the following claims:

1)      "42 USC 1983 Deprivation of Rights Under Fourth, Fifth And Fourteenth Amendments Due To Seizure Of Monies Without Probable Cause" (Count I): which appears to be asserted against Defendants Cram and Rose;

2)       "Deprivation Of Rights Under Fourth, Fifth And Fourteenth Amendment

3

Due To Seizure Of LLC Funds" (Count II), which appears to be asserted against Defendants Cram and Rose;

3) "42 USC 1983 Conspiracy To Deprive Of Rights Guaranteed By Fourth, Fifth And Fourteenth Amendments" (Count III), which appears to be asserted against Defendants Cram, Castelein, Southworth, and BCBS;

4) "42 USC 1985 Conspiracy To Deprive Of Equal Protection, Privileges And Immunities" (Count IV), which appears to be asserted against Defendants Cram, Castelein, Southworth, and BCBS;

5) "42 USC 1983 Deprivation Of Rights Under Fourth Amendment Due To BCBS Participation In Execution Of Warrant" (Count V), which appears to be asserted against Defendants Cram, Schrock, Schlundt, Russell, Gettel, Castelein, Southworth, Clickner, Burnette,Hammerle, Post, Ramirez, Harrison, and BCBS;

6) "42 USC Failure To Train/Supervisory Liability" (Count VI), which appears to be asserted against "Jackson County," and the Township of Blackman (*see* Am. Compl. at 29), even though Plaintiffs named the "Jackson County Sheriff Department" and the "Blackman Township Public Safety Department" (*see* caption of Am. Compl. and ¶¶ 117-18);

7) "42 USC Abuse of Process (BCBSM)" (Count VII), asserted against BCBS; and

8) "42 USC Malicious Prosecution (Castelein & BCBSM)," (Count VIII), asserted against Castelein and BCBS.

(Am. Compl.)

On December 26, 2013, the BCBS Defendants filed the instant Motion for Judgment on the Pleadings.  (Docket Entry No. 28).

**B.    Factual Background Set Forth By Plaintiffs' Allegations And Orders Issued In Related State-Court Civil And Criminal Actions.**

BCBS's Motion for Judgment on the Pleadings was brought pursuant to Fed. R. Civ. P. 12(c).  The standard that applies to this motion is the same standard that applies to a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6).  For purposes of a Rule 12(c) motion, all

4

well-pleaded material allegations "must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008). A Rule 12(c) motion is appropriately granted "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Id.*

For purposes of this motion, the Court may consider: 1) documents referenced in, or attached to, the complaint and central to the plaintiff's claims; 2) matters of which a court may properly take notice; and 3) public documents and records. *Costello v. Bank of New York Mellon*, 2013 WL 317746 (E.D. Mich. 2013); *Meyer v. Citimortgage, Inc.*, 2012 WL 511995 (E.D. Mich. 2012); *Devlin v. Kalm*, __F. App'x __, 2013 WL 4265757 (6th Cir. 2013). Thus, this Court can consider opinions and orders issued in related state-court civil and criminal actions.

The pending motion filed by the BCBS Defendants does not provide a full account of all that has transpired in the state courts that is related to this action. As shown below, Plaintiffs' statement that this "matter has an exceptionally complicated factual and procedural history, involving multiple civil and criminal" actions, is accurate.

### 1.      Relationship Between Sampson and BCBS

Plaintiff Dr. John Sampson is a physician, licensed to practice medicine in Michigan. (Am. Compl. at ¶ 5). Dr. Sampson and his wife, Plaintiff Cecilia Sampson, own or have an interest in two business entities, Argyle and Fourth Street Properties. Mrs. Sampson is employed by Argyle (the medical practice).

Dr. Sampson entered into contracts with BCBS, under which he agreed to provide

5

medical services to BCBS members in exchange for payment.  In 1995, he entered into a

Traditional Agreement with BCBS and in 2004 he entered into a Participating Physician

Agreement.  (Am. Compl. at ¶ 28).  Those contracts contain provisions for audit, dispute and

appeal processes, and recovery of overpayments.  (Am. Compl. at ¶ 29).

Following an audit that began in August of 2009, BCBS advised Dr. Sampson in

December of 2009 that preliminary audit results identified a minimum overpayment of

$527,585.12 but that the audit was not complete. (Am. Compl. at ¶¶ 30-32).  On January 4, 2010,

Castelein, a BCBS investigator, spoke with Dr. Sampson on the telephone about the audit but

"upon Dr. Sampson's expression of dismay and outrage regarding the audit and intent to have his

attorney involved, Castelein terminated the conversation."  (Am. Compl. at ¶ 33).

Plaintiffs allege that neither Castelein nor any other representative of BCBS made a

complaint to "the Attorney General for investigation under the Health Care False Claims Act,

MCL 752.1008," and instead, Castelein "initiated criminal proceedings to collect the amounts

allegedly owed" to BCBS.  (Am. Compl. at ¶ 35).

Plaintiffs allege that on "January 12, 2010, Castelein met with one or more Jackson

County assistant prosecutors and Det[ective] Cram," who is employed by the Michigan State

Police.  (Am. Compl. at ¶ 11 & 36).  "Castelein provided Det. Cram, and possibly others, with a

three-inch binder of information pertaining to BCBSM's investigation of Dr. Sampson." (Am.

Compl. at ¶ 37).  "On January 15, 2010, relying entirely upon the information provided by

Castelein without further investigation, and alleging criminal activity under the Health Care False

Claims Act, search warrants were issued for search of Argyle and Trillium[1]" for a wide variety of patient files and records.

On January 19, 2010, Detective Cram and her team executed those search warrants at Argyle and Trillium. (Am. Compl. at ¶¶ 39-41).  At the request of Detective Cram, the following five members of the Jackson County Major Crimes Task Force "assisted in the execution of the warrants:" Detective Schrock, Detective Schlundt, Detective Rose, Detective Russell, and Trooper Gettel.  (Am. Compl. at ¶ 41).

Plaintiffs allege that Detective Cram "invited Castelein to put together a team from BCBSM to participate in the execution of the search warrants.  Castelein, using his own discretion as to the number of BCBSM employees and their expertise, chose to bring the eight BCBSM employees who are named as Defendants,[2] some of whom had prior knowledge of some portions of the investigation, others of who [sic] did not; all had been in law enforcement prior to their employment at BCBSM."  (Am. Compl. at ¶¶ 43-44).  Plaintiffs allege that "Castelein utilized the search to gather information to sue in collecting sums allegedly owed by BCBSM."  (Am. Compl. at ¶ 46).

On January 19, 2010, Detective Cram also obtained a search warrant for the Sampson's home, to search for records and documents.  (Am. Compl. at ¶ 47).  Plaintiffs allege that search, which was done with "members of the Jackson County Major Crimes Tax [sic] Force and

---

[1]Argyle also does business as Trillium Cosmetic Surgery Center in Okemos, Michigan. (Am. Compl. at ¶ 7).

[2]In addition to Castelein, the named Defendants from BCBS are: 1) Southworth; 2) Burnette; 3) Hammerle; 4) Clickner; 5) Post; 6) Ramirez; and 7) Harrison.

BCBSM employees" was illegal. (Am. Compl. at ¶ 48).

On January 19, 2010, Det. Cram with Det. Rose executed warrants for Citizens Bank, National City Bank, and Pension Consultants, Inc. to "seize all assets in all business and personal accounts owned by Dr. Sampson, Mrs. Sampson, Argyle, and Pension Consultants, Inc." (Am. Compl. at ¶ 49). Those warrants also froze all future deposits into those accounts. (Am. Compl. at ¶ 50). "In total, Plaintiffs had approximately $750,000 seized and/or frozen, including accounts and monies belonging to [Fourth Street Properties]." (Am. Compl. at ¶ 51).

At this point, no criminal charges had been filed against any of the Plaintiffs.

**2.      Plaintiffs Unsuccessfully Challenge the Search Warrant and Seizure Of Funds in District Court**

Plaintiffs' Amended Complaint reflects that there was an action initiated in district court in Jackson County to challenge the search warrant and seizure of funds, district court case number 10-0002-GZO. That case had a case caption of "IN RE: Search of Citizens Bank Accounts, Pension Consultants, Inc. Account, and National City Bank PNC Account." It was an action brought by the Sampsons and their business entities to challenge the search warrant and seek return of monies that had been seized. (Am. Compl. at ¶ 53). There were orders issued in that case by the district court but they are not part of the record before this Court. But other filings reflect that the district court judge upheld the warrants/seizures. The record before this Court also does not include copies of the search warrants or their supporting affidavits.

**3.      Plaintiffs Appeal to the Circuit Court and Prevail**

The Sampsons and their business entities appealed to the Jackson County Circuit Court. The case was assigned to the Honorable Chad Schmucker.

In an Opinion & Order issued on April 1, 2010, Judge Schmucker ruled that the seizure of

funds "was unlawful in this case" and he reversed the district court's rulings and ordered the

seized funds released and returned. (*See* 4/1/10 Opinion & Order, Docket Entry No. 32-1, at 7).

That Opinion & Order explained that Plaintiffs were "challenging a search warrant authorized by

the 12th District Court and executed in mid-January 2010." (*Id.* at 1). It stated that Plaintiffs

(the petitioners there) were not challenging the seizure of records and documents, but rather,

challenged "the seizure of the financial assets including the accounts at National City Bank,

Citizens Bank, and Pension Consultants, Inc., and the seizure of any money and checks at the

home and office of the doctor." (*Id.*). It noted that "Dr. Sampson, his wife, and his business

have not been charged with any crime," and that no forfeiture action had been commenced

against them either. (*Id.*). It noted that the challenged warrant authorized the taking of all funds

in the bank accounts of the Plaintiffs, the entire pension fund, and any money or checks at the

business or home of Dr. Sampson and that the "search warrant does not limit the amount of

money which can be taken." (*Id.* at 2). Judge Schmucker stated, in pertinent part:

> I have reviewed the affidavits. I am convinced they establish probable cause for
> intentional over-billing of substantial amounts and establish a substantial health
> care fraud. The affidavits clearly support a search for and a seizure of billing,
> financial and medical records.
> . . . .
> The Affidavit does not establish how either the bank accounts or the Pension Plan
> are involved in the medical billing fraud. The affidavit merely describes the fraud
> and states these accounts exist.
> . . . .
> The basis for the search warrant is primarily, if not exclusively, the result of Blue
> Cross/Blue Shield's investigation. They presented the State Police with a 3 inch
> binder that was read, but from the record, it does not appear that any additional
> independent investigation was conducted by the State Police.
> . . . .
> This warrant allows the taking of money which is clearly unrelated to Blue Cross
> billings.
> . . . .
> In summary, these assets do not fall within MCL 880.655, which describes the

property that can be seized with a warrant.  The Affidavit for this search warrant
does not establish probable cause that they fall into any of the listed categories.

(*Id*. at 2-4).  The Opinion & Order further rejected the prosecution's argument that the property

was subject to forfeiture under RICO, explaining that the process under the relied upon forfeiture

provision "is conviction, order of forfeiture and then seizure.  Nothing in [the relied upon statute]

suggests a seizure can occur before conviction, much less before someone has been charged."

(*Id*. at 5).

> Judge Schmucker's Opinion & Order concluded by stating, in pertinent part, that:
>
> These search warrant do not establish probable cause for seizure of the bank
> accounts, cash, checks, or pension plans.  These items are not included within the
> listed property that can be seized in MCL 780.652.  As such, the search warrant is
> overbroad.  Even though there is evidence of a crime, it will not allow the seizure
> of these items at this time.
> . . . .
> The Affidavit for a search warrant establish a substantial fraud.  I acknowledge
> that the amount of money is large, even for a high-earning medical doctor.  I am
> not suggesting the money cannot be subject to civil forfeiture procedure or that
> access to the money somehow cannot be restricted by conditions of bond. But, I
> find that the seizure was unlawful in this case and I am reversing the District
> Court and ordering these items released and returned.
>
> THIS IS A FINAL ORDER.

(*Id*. at 7).

### 4.    Plaintiffs are then Charged Criminally in Jackson County Circuit Court

Plaintiffs' Complaint states that "[o]n April 7, 2010, Dr. Sampson and Mrs. Sampson

were criminally charged with 20 counts of making false claims and one count of conspiracy

under the Health Care False Claims Act."  (Am. Compl. at ¶ 58).  "On May 18, 2010, Argyle was

charged with one count of conspiracy under the Health Care False Claims Act and five counts of

intent to defraud with false pretenses." (*Id*. at ¶ 68).

10

"All but five of the counts against Dr. Sampson and Mrs. Sampson were dropped on May 21, 2010." (*Id*. at ¶ 59). "On September 17, 2010, all charges against Argyle were dropped." (*Id*. at ¶ 70). "Thereafter, the charges against Dr. Sampson and Mrs. Sampson were reduced to taking money under false pretenses and health care conspiracy." (*Id*. at ¶ 71).

But "[o]n October 22, 2010, Felony Complaints were reissued against Dr. Sampson and Mrs. Sampson, this time for Health Care Fraud/False Claims (15 counts)." (*Id*. at ¶ 72).

"Then, on February 3, 2011, felony information was again issued, and currently Dr. Sampson is charged with fifteen counts of Health Care Fraud/False Claims, and Mrs. Sampson is charged with ten counts." (*Id*. at ¶ 73).

**5.  Meanwhile, BCBS Files a Civil Action Against the Sampsons in Jackson County Circuit Court**

Meanwhile, in April of 2010, BCBS initiated a civil action against John Sampson and Argyle in Jackson County Circuit Court. (*See* Docket Entry No. 26-6, and Am. Compl. at ¶ 59, alleging that "On April 12, 2010, BSBSM filed a civil complaint against Dr. Sampson and Argyle alleging various claims for overpayment.").

Plaintiffs allege that on April 20, 2010, BCBS filed a motion for preliminary injunction "to prevent the return of the monies that had been illegally seized as required by the April 1, 2010 Order" and that the "motion relied upon the information which Castelein wrongfully obtained during the execution of the warrant (i.e., that Dr. Sampson was Jamaican and therefore might abscond with the monies." (Am. Compl. at ¶ 61). "At hearing held on April 27, 2010, BCBSM argued that the illegally seized monies were restitution for sums owed to BSBSM and should not be released to Dr. Sampson because he was Jamaican." (Am. Compl. at ¶ 64; *see also* Castelein Affidavit, Docket Entry No. 26-6 at ¶ 3, wherein he states that he attended the

execution of the search warrants on January 19, 2010, and during that time, observed Dr. Sampson's most recent tax return identified him as a citizen of Jamaica, a passport identifying him as a Jamaican citizen, documents that show he owns real property in Jamaica, and documents showing he owns various financial accounts in Antigua and Jamaica.).

"Judge Schmucker denied the Motion for Preliminary Injunction, and the monies were finally released with a check dated on or around May 7, 2010." (Am. Compl. at ¶ 65). "Thereafter, BSBSM amended its Complaint to include Mrs. Sampson as a Defendant in the civil action." (Am. Compl. at ¶ 66).

Plaintiffs allege that "[f]ollowing Defendants' Motion for Summary Disposition which was granted in part and denied in part, the parties agreed to stay the civil action until the conclusion of the criminal matter." (Am. Compl. at ¶ 67).

### 6.    Plaintiffs File this Action while the Criminal Case is still Pending, but Before The Circuit Court Ruled on a Motion to Suppress

In connection with the criminal cases against them, the Sampsons filed a Motion to Suppress Evidence, with the circuit court judge presiding over the criminal cases, the Honorable Thomas D. Wilson. ( Docket Entry No. 28-2, Copy of 4/10/13 Opinion And Order).  That Opinion & Order states that, with respect to the Motion to Suppress, the court "held an evidentiary hearing on February 22, *2012*, through February 23, *2012*." (*Id.* at 2) (emphasis added).

While the criminal actions were still pending in Jackson County Circuit Court, Plaintiffs initiated this action on January 11, 2013, by filing their original complaint.  At that time, Judge Wilson had not yet issued a ruling as to the Motion to Suppress.

Judge Wilson did not issue a ruling on the Motion to Suppress until April 10, *2013*, when

he issued a written Opinion & Order denying the motion.

### 7.    Circuit Court Decision Denying Motion to Suppress In Criminal Case

On April 10, 2013, Judge Wilson issued an "Opinion And Order Following Defendants'

Motion To Suppress Evidence" that states, in pertinent part:

> Defendants seek to exclude evidence gleaned from the civilian-assisted execution of three police search warrants on January 19, 2010 . . . Defendants claim that civilian participation is not authorized under Michigan law and, in this case, violated the parameters tolerated by the 4th Amendment. In response, the People contend that civilian participation is permissible and the executions lawful because neither the officers nor the recruited civilians exceeded the scope of the warrants.
> . . . .
>    The first issue before the Court is whether the participation of civilians in the execution of a search warrant, an interrogation, or drafting of a police report is *per se* illegal under Michigan law. Unlike federal law, there is no explicit statute authorizing law enforcement to use civilian assistance . . . [and] Defendants have not provided any Michigan legal authority precluding the use of civilians in the execution of search warrants . . . Without a particular state law to violate, the Court must review the legality of the searches in light of the Fourth Amendment. Although the state may grant more protections against governmental intrusions than the US Constitution, it may not grant less. So, in order to pass constitutional muster on both state and federal levels, the searches must comply with the 4th Amendment.
>    Civilian participation in the execution of a search warrant does not automatically violate the 4th Amendment.
> . . . .
> The Sixth Circuit has interpreted civilian assistance in the execution of police searches to be reasonable when (1) the civilians were present on the premises in aid of officers authorized to conduct the particular search, (2) the officers requested the presence of the civilians, and (3( the officers were present and acting in execution of the warrant. *United States v. Clouston*, 623 F2d 485, 486-87 (CA 6 1980). . . Most recently, the Sixth Circuit affirmatively restated the rule from *Bills* in *Stack v. Killian*, 96 F3d 159, 162 FN1 (CA 6 1996): "Police may constitutionally call upon private citizens to assist them, and where assistance is rendered in aid of a warrant, and not for some other purpose, the bounds of reasonableness have not been overstepped."
>    Here, the Court does not find that the bounds of reasonableness have been overstepped. Blue Cross Blue Shield employees were present during the searches to aid the officers in identifying medical documents. The officers were authorized to search the three locations pursuant to three valid search warrants. The officers

13

requested the assistance of Blue Cross Blue Shield, and officers, although outnumbered, were present on each of the premises and searching concurrently with Blue Cross Blue Shield employees. Unlike *Clouston*, nothing was seized by Blue Cross Blue Shield employee that was not authorized by Detective-Sergeant Gee-Cramm. Further, Detective-Sergeant Gee-Cramm did not authorize the seizure of any item that was beyond the scope of the warrant. Despite Blue Cross Blue Shield's latter use of information gained through the searches, at the time of the search, all evidence pursued and gathered benefited the purposes of law enforcement. Because the assistance of Blue Cross Blue Shield employees furthered the authorized goals of the law enforcement investigation, the Court finds that the citizen participation in this case was reasonable and lawful.

Applying the same test, the Court also finds that Blue Cross Blue Shield employees' participation in the interviewing and summary drafts is also reasonable under the 4th Amendment. The civilians were present at law enforcement's request to assist the police with questioning. Even though some of the civilians asked nearly all the questions, the police were present during the entire interview and retained control. The Court is not concerned that a Blue Cross Blue Shield employee drafted a report rather than an officer submitted as his police report because he was present during the interview and takes responsibility for its content. Nor is the reasonableness of the interviews undermined by Blue Cross Blue Shield's private use of information gained from the participation as agents of the law enforcement in government searches because the information was originally obtained to further a [sic] legitimate law enforcement purposes. Although Blue Cross Blue Shield's misuse of the information subsequent to the searches exposes them to civil litigation, it does not render a valid search unreasonable. Therefore,

IT IS HEREBY ORDERED that Defendants' Motion to Suppress is DENIED.

(*Id*.).


## ANALYSIS

In their motion, the BCBS Defendants argue that: 1) although they are private citizens, they are entitled to seek the protection of qualified immunity from suit under § 1983 in this case; and 2) they are entitled to qualified immunity as to all claims asserted against them.

In evaluating this motion, this Court must "first engage in an antecedent inquiry concerning whether [the BCBS Defendants] may properly invoke the defense of qualified

14

immunity." *Lee v. Willey*, __ F. App'x __, 2013 WL 5645773 at * 1 (6th Cir. Oct. 17, 2013). This Court should only proceed to determine the second issue if it first determines that the BCBS Defendants may properly invoke a qualified immunity defense.

I.      **Are The BCBS Defendants Entitled To Seek The Protection Of Qualified Immunity From Suit Under § 1983?**

The BCBS Defendants broadly assert that qualified immunity "is also available to a private citizen" and rely heavily on *Filarsky v. Delia*, 132 S.Ct. 1657 (2012). Citing *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012), they note that when a private person seeks qualified immunity in a § 1983 case, the court must determine: 1) whether there was a firmly rooted history of immunity for similarly situated parties at common law; and 2) and whether granting immunity would be consistent with the history and purpose of § 1983. But their focuses on policy arguments.

In response, Plaintiffs assert that the defense of qualified immunity is not available to the BCBS Defendants. They contend that *Filarsky* does not establish that the BCBS Defendants are entitled to qualified immunity and they also direct the Court to another Supreme Court decision, that predates *Filarsky*, that they believe is more on-point, *Wyatt v. Cole*, 504 U.S. 158 (1992).

As explained below, this Court concludes that the BCBS Defendants are not entitled to seek the protection of qualified immunity from Plaintiffs' § 1983 claims under the circumstances presented in this case.

In *Duncan*, decided in 1988, the Sixth Circuit addressed the question of whether private parties acting under color of state law are entitled to immunity from suit when they act in good faith. *Duncan v. Peck*, 844 F.2d 1261, 1264 (1988). The court answered that question in the

15

negative, holding that "private parties are not eligible for immunity from suit." *Id*.  The *Duncan* court noted that "[c]ourts rarely have had opportunities to examine the propriety of immunity for private parties because the overwhelming number of suits under section 1983 are directed at government officials." *Id*. at 1265.  The court then applied a two-part test to determine whether immunity was warranted: 1) has the party claiming immunity shown that immunity was recognized at common law; and 2) do strong public policy reasons support immunity.  *Id*.  Neither part of the test was met in *Duncan*.  First, the court found "no evidence that the common law ever extended the immunity to include private citizens." *Id*. at 1264.   Second, the court found that "the strong policy reasons justifying official immunity do not apply to private actors." *Id*.  The court noted the following public policy justifications for the doctrine of public immunity:

> (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.

*Id.* at 1254. The court concluded that:

> Neither of these public policy goals are furthered by extending immunity to private parties.  Private parties do not face the dilemma of being required by law to use their discretion in a way that might unfairly expose them to lawsuits.  The second rationale is also unavailable to a private party because a private party is governed only by self-interest and is not invested with the responsibility of executing the duties of a public official in the public interest.

*Id.*

In *Wyatt*, issued in 1992, the Supreme Court granted *certiorari* "to resolve a conflict among the Courts of Appeals over whether private defendants threatened with 42 U.S.C. § 1983

16

liability are, like certain government officials, entitled to qualified immunity from suit." *Wyatt*, 504 U.S. at 161.

The facts underlying *Wyatt* involved a soured cattle partnership. The respondent (Cole) sought to dissolve his partnership with petitioner (Wyatt) but when an agreement could not be reached, he filed a state court complaint in replevin against Wyatt. At that time, there was a state law that provided that an individual could obtain a court order for seizure of property possessed by another by posting a bond and swearing to a state court that the applicant was entitled to the property and that the adversary wrongfully took or detained the property. *Id*. at 160. The statute gave the state court no discretion to deny a writ of replevin. Cole followed the statute and succeeded in having cattle and equipment seized from Wyatt. Wyatt later challenged the constitutionality of the statute and sued Cole, and Cole's attorney, under § 1983. The trial court, and the appellate court, held that Cole and his attorney were entitled to qualified immunity from suit for conduct arising prior to the statute's invalidation. The Supreme Court reversed.

The Court began by explaining that "Section 1983 'creates a species of tort liability that on its face admits of no immunities.'" *Wyatt*, 504 U.S. at 163 (citation omitted). "Nonetheless, we have accorded certain government officials either absolute or qualified immunity from suit if the 'tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine.'" *Wyatt*, 504 U.S. at 163-64 (citations omitted). "If parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871 – § 1 of which codified at 42 U.S.C. § 1983 – we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law."

17

*Id.* "Additionally, irrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions." *Id.*

The Court found that immunity did not exist under the common law, explaining as follows:

> In determining whether there was an immunity at common law that Congress intended to incorporate in the Civil Rights Act, we look to the most closely analogous torts – malicious prosecution and abuse of process. At common law, these torts provided causes of action against private defendants for unjustified harm arising out of the misuse of governmental processes.
> . . . .
> Respondents do not contend that private parties who institute attachment proceedings and who were subsequently sued to malicious prosecution or abuse of process were entitled to absolute immunity. And with good reason; although public prosecutors and judges were accorded absolute immunity at common law, *Imbler v. Pachtman, supra,* at 4210424, 96 S.Ct., at 990-992, *such protection did not extend to complaining witnesses who, like respondents, set the wheels of government in motion by instigating a legal action.*

*Wyatt*, 504 U.S. at 164-65 (emphasis added).

As to the public policy prong of the analysis, the Court concluded "that the rationales mandating qualified immunity for public officials are not applicable to private parties." *Id.* at 167. In doing so, the Court explained that "[q]ualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Id.* "Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service." *Id.* "In short, the qualified immunity recognized in *Harlow* acts

18

to safeguard government, and thereby to protect the public at large, not to benefit its agents." *Id.*

at 168. But it found that those "rationales are not transferable to private parties." *Id.* It noted

that:

> [P]rivate parties hold no office requiring them to exercise discretion; nor are they
> principally concerned with enhancing the public good. Accordingly, extending
> *Harlow* qualified immunity to private parties would have no bearing on whether
> public officials are able to act forcefully and decisively in their jobs or on whether
> qualified applicants enter public service. Moreover, unlike with government
> officials performing discretionary functions, the public interest will not be unduly
> impaired if private individuals are required to proceed to trial to resolve their legal
> disputes. In short, the nexus between private parties and the historic purposes of
> qualified immunity is simply too attenuated to justify such an extensions of our
> doctrine of immunity.

*Wyatt,* 504 U.S. at 168.

Thus, following *Wyatt*, the Sixth Circuit has observed that "[q]ualified immunity is

generally not available to private parties." *Stack v. Killian*, 96 F.3d 159, 163 (6th Cir. 1996)

(citing *Wyatt v. Cole*).

More recently, in *Filarsky*, the Supreme Court addressed the narrow issue of "whether an

individual hired by the government to do its work is prohibited from seeking [qualified]

immunity, solely because he works for the government on something other than a permanent or

full-time basis." *Filarsky v. Delia*, 132 S.Ct. 1657, 1660 (2012). In that case, a city hired an

experienced employment lawyer (Filarsky) to help it with an administrative investigation of an

employee (Delia). Delia later sued Filarsky under § 1983, based upon actions he took during the

investigation. The Ninth Circuit held that because Filarsky was a private attorney and not a city

employee, he was not entitled to seek the protection of qualified immunity. The Supreme Court

reversed.

19

The Supreme Court began its analysis with looking to the common law as it existed in 1871, when Congress enacted § 1983. The Court noted that, at that time, a public servant was often someone who did not devote all of his time to public duties, and was permitted to carry on private business too. It gave several examples, such as a general store owner stepping "behind a window to don his postman's hat." *Filarsky,* 132 S.Ct. at 1662-63. "Even such a core government activity as criminal prosecution was often carried out by a mixture of public employees and private individuals temporarily serving the public. At the time § 1983 was enacted, private lawyers were regularly engaged to conduct criminal prosecutions on behalf of the state." *Id.* Thus, "the common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities." *Id*. at 1663. "The protections provided by the common law did not turn on whether someone we today would call a police officer worked for the government full-time or instead for both public and private employers." The Court also stated that "Sheriffs executing a warrant were empowered by the common law to enlist the aid of the able-bodied men of the community in doing so" and that "[w]hile serving as part of this 'posse comitatus,' a private individual had the same authority as the sheriff, and was protected to the same extent." *Id*. at 1664. Thus, based on looking to the common law that existed in 1871, the Court found that "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." *Id*.

The Court then looked at public policy considerations and found that those considerations also militated in favor of qualified immunity being available to Filarsky. The Court referred to the interest of "avoiding 'unwarranted timidity' on the part of those engaged in the public's

business," as the "most important special government immunity-producing concern."  It then

stated that "[e]nsuring that those who serve the government do so 'with the decisiveness and the

judgment required by the public good," is "of vital important regardless of whether the individual

sued as a state actor works full-time or on some other basis." *Filarsky*, 132 S.Ct. at 1665.

The Court also found that "government's need to attract talented individuals is not limited

to full-time public employees," and that restrict qualified immunity to full-time public employees

would make "it more likely that the most talented candidates will decline public engagements."

The Court also stated that "[s]ometimes, as in this case, private individuals will work in close

coordination with public employees, and face threatened legal action for the same conduct."  *Id*.

at 1666.  "Because government employees will often be protected from suit by some form of

immunity, those working alongside them could be left holding the bag – facing full liability for

actions taken in conjunction with government employees who enjoy immunity for the same

action.  Under such circumstances, any private individual with a choice might think twice before

accepting a government assignment."  *Id.*

The Court also stated that "[d]istinguishing among those who carry out the public's

business based on the nature of their particular relationship with the government also creates

significant line-drawing problems."  *Id.*

The Court stated that its prior decisions, particularly the *Wyatt* decision "are not to the

contrary."  *Id*. at 1666.  The Court stated that in *Wyatt*, it "explained that the reasons underlying

recognition of qualified immunity did not support its extension to *individuals who had no*

*connection to government* and *pursued purely private ends*.  Because such individuals 'hold no

*office* requiring them to exercise discretion; *nor are they principally concerned with enhancing*

21

*the public good*,' we concluded that extending immunity to them would 'have no bearing on whether public officials are able to act forcefully and decisively in their jobs or on whether qualified applicants enter public service." *Id*. (emphasis added).  It further explained that "*Wyatt* is plainly not implicated by the circumstances of this case.  Unlike the defendants in *Wyatt*, *who were using the mechanisms of government to achieve their own ends*, individuals working for the government in pursuit of government objectives are 'principally concerned with enhancing the public good.'" *Id.* (emphasis added).

In *McCullum,* issued after both *Wyatt* and *Filarsky*, the Sixth Circuit set forth the analysis to be used when a private party claims be able to invoke qualified immunity.  The Court must determine whether: 1) there was a firmly rooted history of immunity for similarly situated parties at common law (the history prong of the test); and 2) whether granting immunity would be consistent with the history and purpose of § 1983 (the policy prong of the test).  *McCullum*, 693 F.3d at 700 (citing *Filarsky*).  The Sixth Circuit stated, however, that Supreme Court has not specified whether policy and history form a conjunctive or disjunction test, although "*Wyatt's* plain language points to a conjunctive test."  *McCullum*, 693 F.3d. at 700 n.7.  The Sixth Circuit stated that it chose to treat the test as disjunctive "out of an abundance of caution" but noted that "it may be questionable whether the Supreme Court's jurisprudence in this area would allow a court to extend qualified immunity where there was no history of immunity at common law, even if sound policy justified the extension."  *Id*.  Accordingly, while this Court will analyze both prongs of the test, the first prong is the most important in the analysis.

### A.   Was There A Firmly Rooted History Of Immunity For Similarly Situated Parties At Common Law?

Again, the first prong of the test looks at whether there was a firmly rooted history of immunity for similarly situated parties at common law in 1871, when § 1983 was enacted.

Although the BCBS Defendants acknowledge the first prong of the test, their brief glosses over prong one and focus on policy arguments, citing favorable portions from *Filarsky*.

At oral argument, Counsel for the BCBS Defendants asserted that the BCBS Defendants were simply private citizens aiding the police in executing search warrants.

While it is true that in 1871 Sheriffs executing a warrant were empowered to "enlist the aid of able-bodied men of the community in doing so" and that "[w]hile serving as part of this 'posse comitatus,' a private individual had the same authority as the sheriff, and was protected to the same extent," (*Filarsky, supra,* at 1664), that is not the situation that is alleged here.  The BCBS Defendants were *not uninterested* townspeople who, out of necessity, were asked to aid law enforcement officers with a warrant.  Rather, Plaintiffs allege that the BCBS Defendants were the *complaining witnesses* who instigated the investigation and that they acted in furtherance of BCBS's interests in participating with the searches and that they used information obtained during those searches for BCBS's own purposes.

As the Supreme Court instructed in *Wyatt,* "in determining whether there was an immunity at common law that Congress intended to incorporate in the Civil Rights Act," this Court should "look to the most closely analogous torts."  *Wyatt*, 504 U.S. at 164.  As in *Wyatt*, the most closely analogous torts here are malicious prosecution and abuse of process.  Indeed, Plaintiffs have separately-titled § 1983 counts for malicious prosecution and abuse of process.

23

And *Wyatt* tells us that "[a]t common law, these torts provided causes of action against private defendants for unjustified harm arising out of the misuse of governmental processes." There was no immunity at common law extended for *complaining witnesses*. Accordingly, the Court finds prong one has not been met.

**B.      Would Granting Immunity Be Consistent With The History And Purpose Of § 1983?**

The policy prong of the analysis "hinges on three of § 1983's goals: (1) 'protecting the public from unwarranted timidity on the part of public officials;' (2) 'ensur[ing] that talented candidates were not deterred by the threat of damages suits from entering public service;' *Richardson,* 521 U.S. at 408, 118 S.Ct. 2100, and (3) guarding against the distraction from job duties that lawsuit inevitably create." *McCullum,* 693 F.3d at 704.

**1.      Unwarranted Timidity On The Part of Public Officials**

As to the first goal listed above, the Supreme Court has "called the government interest in avoiding 'unwarranted timidity' on the part of those engaged in the public's business 'the most important special government immunity-producing concern.'" *Filarsky*, 132 S.Ct. at 1665.

As explained in *Wyatt*, however, private parties such as the BCBS Defendants "hold no office requiring them to exercise discretion" and therefore extending immunity to them "would have no bearing on whether public officials are able to act forcefully and decisively in their jobs." *Wyatt*, 504 U.S. at 168.

Moreover, Plaintiffs allege that: 1) the BCBS Defendants initiated criminal proceedings to further their own private interests in collecting or freezing funds allegedly owed to BCBS; 2) a BCBS Defendant approached the prosecutors and the police;  and 3) the BCBS Defendants gave

24

them a three-inch binder of information pertaining to BCBS's investigation of Dr. Sampson. (Am. Compl. at ¶¶ 35-38). The BCBS Defendants were not uninterested parties that the police, for some reason such as their professional expertise,[3] asked to aid them in the execution of the search warrants. Like the private defendants in *Wyatt*, the BCBS Defendants are alleged to have used the government processes to achieve their own ends and were not "principally concerned with enhancing the public good." *Wyatt, supra*, at 168; *Filarsky, supra*, at 1667.

### 2.    Ensuring That Talented Candidates Are Not Deterred From Entering Public Service

The Court finds that this consideration weighs against extending the protection of qualified immunity to the BCBS Defendants for the same reason it did in *Wyatt.* Because the BCBS Defendants hold no public office, extending them qualified immunity would have no bearing on whether qualified applicants enter public service. *Wyatt,* 504 U.S. at 168.

It may discourage private individuals from assisting the government with the execution of search warrants if they are asked to do so (*see Filarsky*, 132 S.Ct. at 1666, noting "any private individual with a choice might think twice before accepting a government assignment") but it does not discourage anyone from entering public service.

### 3.    Guarding Against Distraction From Job Duties That Lawsuits Inevitably Create

"The public interest in ensuring performance of government duties free from the

---

[3]In *Stack v. Killian,* law enforcement officers were executing a search warrant at an animal shelter that was suspected of having animals in very poor physical condition. Law enforcement asked a private veterinarian to assist in the execution of the warrant, presumably for that person's professional expertise in evaluating the condition of the animals. The Sixth Circuit declined to address whether that veterinarian, who did not appear to have any personal interest in the case, was entitled to the protection of qualified immunity.

distractions that can accompany even routine lawsuits" is another factor to consider.  This policy consideration does, arguably, weigh in favor of extending qualified immunity to the BCBS Defendants, based on language in *Filarsky.*  If the case against the BCBS Defendants moves forward, then even if they are dismissed from the suit, the individually-named law enforcement officers will all likely be deposed and/or called to testify at trial.  *Filarsky,* 132 S.Ct. at 1666.  Thus, their performance of their ongoing police duties could be disrupted.

But this Court concludes that is simply not enough to afford BCBS the protection of qualified immunity under the circumstances alleged here, especially when there is no history of such immunity at common law.

The Court concludes that the BCBS Defendants may not invoke the defense of qualified immunity in this action.

Give the Court's ruling on this antecedent inquiry (ie., whether the BCBS Defendants may properly invoke the defense of qualified immunity), the Court shall deny the motion and there is no need to consider whether the BCBS Defendants are entitled to qualified immunity as to each of the multiple claims asserted against them in this action.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that the BCBS Defendants' Motion for Judgment on the Pleadings (Docket Entry No. 28) is DENIED.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  February 18, 2014

26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

John Gilmore Sampson, *et al.*,

      Plaintiffs,

v.                                                                    Case No. 13-10113

Blue Cross Blue Shield of Michigan, *et al.*,    Sean F. Cox
                                                                      United States District Court Judge

      Defendants.

_____/

PROOF OF SERVICE

    I hereby certify that a copy of the foregoing document was served upon counsel of record

on February 18, 2014, by electronic and/or ordinary mail.

                         S/Jennifer McCoy
                         Case Manager

27