UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

John Gilmore Sampson, M.D., *et al.*,

      Plaintiffs,

v.                                Case No. 13-10113

Blue Cross Blue Shield of Michigan, *et al.*,     Sean F. Cox
                                     United States District Court Judge

      Defendants.

_____/

## OPINION & ORDER

Plaintiff John Sampson is physician who had contracts with Blue Cross Blue Shield of

Michigan ("BCBS") under which he provided medical services for patients, in exchange for

reimbursement.  Dr. Sampson, his wife, and business entities that they have interests in, filed this

§ 1983 suit against multiple Defendants, including BCBS and several of its employees, after

those employees aided law enforcement officers in executing search warrants at Dr. Sampson's

home and office.  This matter has twice come before this Court on dispositive motions.  Most

recently, the Court ruled on a Motion for Summary Judgment filed by Defendant Michigan State

police officers Cram and Gettel.  This Court dismissed all claims against those two officers,

except for one count against Defendant Cram that had not been challenged in the motion.

The matter is now before the Court on Defendant Cram's Motion for Summary Judgment

that challenges the remaining claim against her.  In addition, the Jackson County Defendants, and

the Blackman Township Defendants, have filed motions for summary judgment seeking

dismissal of all claims asserted against them.  The parties have briefed the issues and the Court

1

heard oral argument on January 15, 2015.  For the reasons below, the Court shall GRANT the

pending motions and shall dismiss the remaining claim against Defendant Cram, and shall

dismiss all claims against the Jackson County and Blackman Township Defendants.

## BACKGROUND

**A.    Procedural Background**

Plaintiffs John Gilmore Sampson, M.D. and Cecelia Sampson, Argyle Plastic and

Reconstructive Surgery, P.C. ("Argyle"), Fourth Street Properties, LLC ("Fourth Street

Properties"), and John Sampson, M.D., Trustee/Fiduciary of the Argyle Plastic and

Reconstructive Surgery, P.C. 401(k) Profit Sharing Plan and Trust ("the Trust") filed this action

in federal court on January 11, 2013, based on federal-question jurisdiction.

Plaintiffs' original Complaint named numerous Defendants and asserted the following

claims: "42 USC 1983 Deprivation of Rights Under Fourth, Fifth And Fourteenth Amendments

Due To Seizure Of Monies Without Probable Cause" (Count I); "Deprivation Of Rights Under

Fourth, Fifth And Fourteenth Amendment Due To Seizure Of LLC Funds" (Count II); "42 USC

1983 Conspiracy To Deprive Of Rights Guaranteed By Fourth, Fifth And Fourteenth

Amendments" (Count III); "42 USC 1985 Conspiracy To Deprive Of Equal Protection,

Privileges And Immunities" (Count IV); "42 USC 1983 Deprivation Of Rights Under Fourth

Amendment Due To BCBS Participation In Execution Of Warrant" (Count V); "42 USC Failure

To Train/Supervisory Liability" (Count VI); "42 USC Abuse of Process (BCBSM)" (Count VII);

"Abuse Of Process (Common Law)" (Count VIII); "Attorney Fees And Costs Under MCL

750.159a" (Count IX); "Invasion Of Privacy" (Count X); "Intentional Infliction Of Emotional

Distress Dr. And Mrs. Sampson" (Count XI); "Breach Of Contract" (Count XII); "Interference

2

With Business Relations And Contract" (Count XIII); "Promissory Estoppel" (Count XIV);

"Concert Of Action" (Count XV); "Common Law Conspiracy" (Count XVI); and "Respondeat

Superior" (Count XVII).

On January 22, 2013, this Court issued an "Order Declining To Exercise Supplemental

Jurisdiction Over State-Law Claims" (Docket Entry No. 3) and dismissed the following counts

without prejudice: Counts VIII, IX, X, XI, XII, XIII, XIV, XV, XVI, and XVII.  That left Counts

I through VII remaining.

On September 20, 2013, Plaintiff filed an Amended Complaint (Docket Entry No. 19)

that named the following Defendants: 1) BCBS; 2) Detective Sergeant Lisa Gee-Cram ("Cram");

3) Detective Robert Schrock ("Schrock"); 4) Detective Timothy Schlundt; 5) Detective Lee Rose

("Rose"); 6) Detective Sergeant Brian Russell ("Russell"); 7) Trooper Gina Gettel ("Gettel"); 8)

Blackman Township Public Safety Department; 9) Jackson County Sheriff Department; 10) the

Jackson County Prosecutor's Office;

11) David Castelein ("Castelein"); 12) John Southworth ("Southworth"); 13) Nina Burnette

("Burnette"); 14) Patricia Hammerle ("Hammerle"); 15) Thomas Clickner ("Clickner"); 16)

Susan Post ("Post"); 17) Roger Ramirez ("Ramirez"), and 18) Larry Harrison ("Harrison").

On February 4, 2014, Defendants Cram and Gettel filed a Motion for Summary

Judgment.  (D.E. No. 35).

On February 21, 2014, Plaintiffs filed a motion seeking to file a Second Amended

Complaint in order to drop their claims against the Jackson County Prosecutor's Office, the

Jackson County Sheriff Department, and the Blackman County Public Safety Department and,

instead, name Jackson County and Blackman Township as Defendants.  This Court granted that

3

Motion.  (Docket Entry No. 55).

Plaintiffs' Second Amended Complaint is the operative complaint in this action and it asserts the following claims:

**"42 USC 1983 Deprivation of Rights Under Fourth, Fifth And Fourteenth Amendments Due To Seizure Of Monies Without Probable Cause" (Count I)**: this count, which is asserted against Defendants Cram and Rose, alleges that the seizure of funds under the financial warrants was unlawful because the warrants were issued despite the lack of probable cause and no reasonably trained officer could have believed that the warrants contained probable cause.

**"Deprivation Of Rights Under Fourth, Fifth And Fourteenth Amendment Due To Seizure Of LLC Funds" (Count II):** this count, which is asserted against Defendants Cram and Rose, alleges that the officers seized money from accounts belonging to Fourth Street Properties without a warrant authorizing them to do so.

**"42 USC 1983 Conspiracy To Deprive Of Rights Guaranteed By Fourth, Fifth And Fourteenth Amendments" (Count III):** this count, which is asserted against Defendants Cram, Castelein, Southworth, and BCBS, alleges that Defendants conspired to obtain money from Plaintiffs for restitution of alleged overpayments by BCBS without civil or criminal process and to prevent Plaintiffs from access.

**"42 USC 1985 Conspiracy To Deprive Of Equal Protection, Privileges And Immunities" (Count IV):** this count, which is asserted against Defendants Cram, Castelein, Southworth, and BCBS, alleges that Defendants conspired to deprive Plaintiffs of equal protection of the law because of Dr. Samson's national origin.

**"42 USC 1983 Deprivation Of Rights Under Fourth Amendment Due To BCBS Participation In Execution Of Warrant" (Count V):** this count, which is asserted against Defendants Cram, Schrock, Schlundt, Russell, Gettel, Castelein, Southworth, Clickner, Burnette, Hammerle, Post, Ramirez, Harrison, and BCBS, alleges that Defendants violated Plaintiffs' rights by having BCBS participate in the execution of search warrants and that participation was illegal because BCBS used the search to further its own interests.

**"42 USC Failure To Train/Supervisory Liability" (Count VI)**: this Count seeks to impose liability against Jackson County and Blackman Township on a failure-to-train theory of municipal liability.

4

> **"42 USC Abuse of Process (BCBSM)" (Count VII):** this Count, asserted against BCBS, alleges that BCBS misused the judicial process to search for information to assist in its civil collection of claims.
>
> **"42 USC Malicious Prosecution (Castelein & BCBSM)," (Count VIII)**: this count, asserted against Castelein and BCBS, alleges that BCBS initiated criminal proceedings out of malice or for purposes of securing money from Plaintiffs without due process.

(Sec. Am. Compl.).

In an Opinion & Order issued on September 16, 2014, this Court granted in part and denied in part a Motion for Summary Judgment filed by Defendants Cram and Gettel. (Docket Entry No. 70). More specifically, this Court granted the motion to the extent that it: 1) dismissed Count I as to Defendant Cram because she is entitled to qualified immunity; 2) dismissed Count V as to Defendants Cram and Gettel because they are entitled to qualified immunity and Plaintiffs' request for a generalized "obey the law" injunction fails; and 3) dismissed both civil conspiracy claims against Defendant Cram (Counts III & IV). The Court denied the motion without prejudice as to Count II, which was asserted against Defendant Cram but not Gettel, because Cram had not challenged that count. The Court indicated that Defendant Cram could file a new motion specifically challenging Count II, if she wished to do so.

Thereafter, Defendant Cram filed a Motion for Summary Judgment seeking dismissal of Count II. In addition, the Jackson County Defendants and the Blackman Township Defendants filed their own motions for summary judgment.

**B.      The Pending Motions For Summary Judgment All Raise The Defense Of Qualified Immunity**

Discovery in this matter has not concluded. Nevertheless, Defendants Cram, the Jackson County Defendants, and the Blackman Township Defendants each filed a Motion for Summary

5

Judgment that raises the defense of qualified immunity.

Under the doctrine of qualified immunity, governmental officials, including police officers, are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights. *Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir. 2009); *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008). Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was "clearly established" at the time of the violation. *Harris v. City of Circleville,* 583 F.3d 356, 365 (6th Cir. 2009). The Court is free to consider those inquiries in whatever order it deems appropriate in the light of the issues presented. *Jones*, 534 F.3d at 975.

"[A] qualified immunity defense can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as an affirmative defense at trial." *English v. Duke*, 23 F.3d 1086, 1089 (6th Cir. 1994). The Supreme Court, however, has reiterated that questions of qualified immunity should be resolved at the earliest possible stage in the litigation or the "driving force" behind the immunity – avoiding unwarranted discovery and other litigation costs – will be defeated." *Everson v. Leis*, 556 F.3d 484, 492 (6th Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223).

The Sixth Circuit has held that when faced with a motion for summary judgment based on qualified immunity, the district court cannot avoid ruling on the issue "solely because discovery was not complete." *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004). In such circumstances, the district court should determine – prior to any further discovery – whether the

6

plaintiff's complaint alleged the violation of a constitutional right at all, and if so, whether that right was clearly established at the time of the alleged violation. *Summers,* 368 F.3d at 886; *Skousen v. Brighton High Sch.*, 305 F.3d 520, 527 (6th Cir. 2002). If so, the Court should turn to "the question of whether any facts material to [the plaintiff's] claim [are] genuinely at issue, an inquiry that require[s] the court to review the motion and its supporting documents as well the plaintiff's opposition and its supporting documents." *Skousen,* 305 F.3d at 527.

"Qualified immunity is an affirmative defense, and a defendant bears the burden of pleading it in the first instance." *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). "Once the defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate" both that the challenged conduct violated a constitutional right and that the right was clearly established. *Id.* "If the plaintiff fails to establish either element, the defendant is immune from suit." *Id.*

**C.    Factual Background Set Forth By Plaintiffs' Allegations, Orders Issued In Related State-Court Civil And Criminal Actions, Undisputed Facts, And Other Evidence Submitted In Connection With The Pending Motions.**

In keeping with the above, the following material facts are gleaned from: 1) the allegations set forth in Plaintiffs' Second Amended Complaint; 2) opinions and orders issued in the related state-court criminal and civil actions; 3) undisputed facts contained in the parties' respective statements submitted in connection with the pending motions[1]; and 4) other evidence submitted by the parties in connection with the pending motions.

Where the Court considers evidence presented by the parties, it shall construe the

---

[1]*See* this Court's practice guidelines for summary judgment motions, incorporated into the Scheduling Order (D.E. No. 18 at 2-3).

evidence in the light most favorable to Plaintiffs, the non-moving parties.

### 1.    Relationship Between Sampson And BCBS

Plaintiff Dr. John Sampson is a physician, licensed to practice medicine in Michigan. (Sec. Am. Compl. at ¶ 5). Dr. Sampson and his wife, Plaintiff Cecilia Sampson, own or have an interest in two business entities, Argyle and Fourth Street Properties.[2] Mrs. Sampson is employed by Argyle (the medical practice).

Dr. Sampson entered into contracts with BCBS, under which he agreed to provide medical services to BCBS members in exchange for payment.  In 1995, he entered into a Traditional Agreement with BCBS and in 2004 he entered into a Participating Physician Agreement.  (Sec. Am. Compl. at ¶ 28).  Those contracts contain provisions for audit, dispute and appeal processes, and recovery of overpayments.  (Sec. Am. Compl. at ¶ 29).

Following an audit that began in August of 2009, BCBS advised Dr. Sampson in December of 2009 that preliminary audit results identified a minimum overpayment of $527,585.12 but that the audit was not complete. (Sec. Am. Compl. at ¶¶ 30-32).  On January 4, 2010, Castelein, a BCBS investigator, spoke with Dr. Sampson on the telephone about the audit but "upon Dr. Sampson's expression of dismay and outrage regarding the audit and intent to have his attorney involved, Castelein terminated the conversation."  (Sec. Am. Compl. at ¶ 33).

Plaintiffs allege that neither Castelein nor any other representative of BCBS made a complaint to "the Attorney General for investigation under the Health Care False Claims Act, MCL 752.1008," and instead, Castelein "initiated criminal proceedings to collect the amounts allegedly owed" to BCBS.  (Sec. Am. Compl. at ¶¶ 34 & 35).

---

[2]Dr. Sampson alone owns and controls Argyle.  (Docket Entry No. 67 at 6 n.3).

8

Plaintiffs allege that on "January 12, 2010, Castelein met with one or more Jackson County assistant prosecutors and Det[ective] Cram," who is employed by the Michigan State Police.  (Sec. Am. Compl. at ¶ 11 & 36).  "Castelein provided Det. Cram, and possibly others, with a three-inch binder of information pertaining to BCBSM's investigation of Dr. Sampson." (Sec. Am. Compl. at ¶ 37).  "On January 15, 2010, relying entirely upon the information provided by Castelein without further investigation, and alleging criminal activity under the Health Care False Claims Act, search warrants were issued for search[es] of Argyle and Trillium[3]" for a wide variety of patient files and records.  (*Id.* at ¶ 38).

On January 19, 2010, Detective Cram and her team executed those search warrants at Argyle and Trillium. (Sec. Am. Compl. at ¶¶ 39-41)  At the request of Detective Cram, the following five members of the Jackson County Major Crimes Task Force "assisted in the execution of the warrants:" Detective Schrock, Detective Schlundt, Detective Rose, Detective Russell, and Trooper Gettel.  (Sec. Am. Compl. at ¶ 41).

Plaintiffs allege that Detective Cram "invited Castelein to put together a team from BCBSM to participate in the execution of the search warrants.  Castelein, using his own discretion as to the number of BCBSM employees and their expertise, chose to bring the eight BCBSM employees who are named as Defendants,[4] some of whom had prior knowledge of some portions of the investigation, others of who [sic] did not; all had been in law enforcement prior to

---

[3]Argyle also does business as Trillium Cosmetic Surgery Center in Okemos, Michigan. (Sec. Am. Compl. at ¶ 7).

[4]In addition to Castelein, the named Defendants from BCBS are: 1) Southworth; 2) Burnette; 3) Hammerle; 4) Clickner; 5) Post; 6) Ramirez; and 7) Harrison.

their employment at BCBSM." (Sec. Am. Compl. at ¶¶ 43-44). Plaintiffs allege that "Castelein utilized the search to gather information to sue in collecting sums allegedly owed by BCBSM." (Sec. Am. Compl. at ¶ 46).

On January 19, 2010, Detective Cram also obtained a search warrant for the Sampson's home, to search for records and documents. (Sec. Am. Compl. at ¶ 47). Plaintiffs allege that search, which was done with unspecified "members of the Jackson County Major Crimes Tax [sic] Force and BCBSM employees" was illegal. (Sec. Am. Compl. at ¶ 48).

It is undisputed that a search warrant relating to Citizens Bank was issued. It is also undisputed that Defendant Cram drafted that search warrant and its accompanying affidavit and that a state-court judge then signed and approved the warrant. That search warrant (Docket Entry No. 76-2) described the person, place, or thing to be searched as "Citizens Bank at One Jackson Square or any other Citizens Bank Branch in the State of Michigan. The account number of [ ] in the name of Argyle Plastic & Reconstructive Surgery PC, Dr. John Sampson, MD, or Trillium Cosmetic Surgery Center" and "[a]ny and all safety deposit boxes with the name of Argyle Plastic & Reconstructive Surgery, PC, Dr. John Sampson, and/or Trillium Cosmetic Surgery Center." (*Id.*). That search warrant described the property to be seized, if found, as the "assets of any and all accounts related to the above requested business(s) are to be seized and turned over to the Michigan State Police at the time of execution of this search warrant and the account is to be frozen against further withdrawals. Any funds that are deposited into the above account(s) after the time of the seizure are to be frozen until further order of this honorable court." (*Id.*).

Plaintiffs allege that on January 19, 2010, Det. Cram and Det. Rose executed warrants for Citizens Bank, National City Bank, and Pension Consultants, Inc. to "seize all assets in all

10

business and personal accounts owned by Dr. Sampson, Mrs. Sampson, Argyle, and Pension

Consultants, Inc." (Sec. Am. Compl. at ¶ 49). Those warrants also froze all future deposits into

those accounts. (Sec. Am. Compl. at ¶ 50). "In total, Plaintiffs had approximately $750,000

seized and/or frozen, including accounts and monies belonging to [Fourth Street Properties]."

(Sec. Am. Compl. at ¶ 51).

As to the execution of the search warrant at Citizens Bank, Defendant Cram submitted an

Affidavit that states that Detective Rose (from the Jackson County Sheriff Department and Jim

Shaw, who was the Michigan State Police Post Commander at the Jackson Post at the time, were

asked to serve the search warrant on Citizens Bank. (Cram Aff. at ¶ 6). A report authored by

Detective Rose (Docket Entry No. 73-1) also indicates that Rose and Shaw executed the search

warrant at Citizens Bank:

> INCIDENT SUMMARY:
>
> I was contacted by D/Sgt. Lisa Gee-Cram of the Michigan State Police and asked
> for the assistance of the Jackson County Major Crimes Task Force. Detective
> Schlundt, Detective Russell and I did assist as asked. The following is a report of
> the actions taken by the Jackson County Office of the Sheriff task force members.
>
> My role was to accompany Lt. Jim Shaw of the Michigan State Police to Citizens
> Bank to execute a search warrant on the accounts of Dr. John Sampson.

(Docket Entry No. 73-1). Rose's report states the following as to the execution of the search

warrant at Citizens Bank:

> Lt. Shaw and I did go to Citizens Bank at 100 E Michigan Ave, Jackson, MI.
> once at that location we made contact with Clara Adams, Personal Banker, who
> assisted us with execution of this search warrant.
>
> I did serve this search warrant on Ms. Adams on January 19, 2010 at
> approximately 0945 hrs. She made contact with Doug Rosier of the Citizens
> Bank Fraud Prevention Division. I did speak with Mr. Rosier on the telephone

11

and was told that he would be reviewing the search warrant and would return a call to Ms Adams phone shortly.  Approximately 15 minutes later Ms. Adama was contacted by Brenda Sprague with the Fraud Prevention Division of Citizens Bank.  She did speak to me on the phone and indicated that they would fully comply with the search warrant.  Ms. Sprague did get on the telephone with Ms. Adams and they searched for accounts to which Dr. John Sampson could be tied to.  They were able to locate six different accounts and one CD of deposit for Dr. Sampson.  These accounts had various amounts of money in them as listed below.

| Account Number | Account Name | Account Balance |
|---|---|---|
| [ ] | Argyle Plastic | $19,777.27 |
| [ ] | Argyle Plastic | $81,334.45 |
| [ ] | Argyle Plastic | $    43.04 |
| [ ] | John A. Sampson | $10,726.25 |
| [ ] | John A. Sampson | $ 4,753.20 |
| [ ] | **Fourth St. Properties LLC** | **$10,086.08** |
| [ ] (CD) | John A. Sampson | $52,622.41 |

Once these accounts were discovered Citizens Bank took the necessary steps to freeze the accounts by placing a hold on the funds in the accounts . . .

As indicated in the search warrants these funds were to be turned over to Lt. Shaw and me in the form of Cashier's Checks. The checks were in the following amounts.

| Check Number | Amount of Check |
|---|---|
| 31303468 | $52,200.31 this is the amount of the CD minus the penalty |
| 31303469 | $126,720.30 this is the total amount of all accounts except CD |

These Cashier's Checks were turned over to Lt. Shaw and deposited into a Michigan State Police account at Comerica Bank shortly after leaving Citizens bank.

(Docket Entry No. 73-1 at Pg ID 2448-49) (emphasis added).  Detective Rose's report also indicates that additional funds were later seized from Citizens Bank:

SEARCH WARRANT CITIZENS BANK RECONTACT:

12

On January 20, 2010 at approximately 0815 hrs I was contacted by Brenda Sprague of Citizens Bank Fraud Prevention Division and advised that after my contact with their bank on January 19, 2010 they had located another account held by Dr. John Sampson. This account was in the name of Fourth Street Properties LLC with Dr. Sampson as the signer on the account. Ms. Sprague informed me that in compliance with the search warrant that Citizens Bank has also placed a hold on this account not allowing any withdraws but will continue to allow deposits into this account. Ms. Sprague also advised that they would be preparing a check for me to pick up from Clara Adams in the amount of the account balance. The information for the account is as follows.

| Account Number | Account Name | Account Balance |
| --- | --- | --- |
| 80082123 | Fourth Street Properties LLC | $32,836.12 |

On January 20, 2010 at approximately 1315 hrs I responded to Citizens Bank at 100 E Michigan Ave, Jackson, MI. where I met with Clara Adams and did receive a Cashier's Check in the amount of $32,836.12.

This Cashier's Check was turned over to D/Sgt. Gee-Cram to be deposited with the funds obtained in the prior search warrant at Citizens Bank.

(Docket Entry No. 73-1 at Pg ID 2450).

At this point, no criminal charges had been filed against any of the Plaintiffs.

### 2.    Plaintiffs Unsuccessfully Challenge The Search Warrant And Seizure Of Funds In District Court

Plaintiffs' Second Amended Complaint reflects that there was an action initiated in district court in Jackson County to challenge the search warrant and seizure of funds, district court case number 10-0002-GZO. That case had a case caption of "IN RE: Search of Citizens Bank Accounts, Pension Consultants, Inc. Account, and National City Bank PNC Account." It was an action brought by the Sampsons and their business entities to challenge the search warrant and seek return of monies that had been seized. (Sec. Am. Compl. at ¶ 53). There were orders issued in that case by the district court but they are not part of the record before this Court. But

13

other filings reflect that the district court judge upheld the warrants/seizures.

### 3.      Plaintiffs Appeal To The Circuit Court And Prevail

The Sampsons and their business entities appealed to the Jackson County Circuit Court. The case was assigned to the Honorable Chad Schmucker.

In an Opinion & Order issued on April 1, 2010, Judge Schmucker ruled that the seizure of funds "was unlawful in this case" and he reversed the district court's rulings and ordered the seized funds released and returned. (*See* 4/1/10 Opinion & Order, Docket Entry No. 32-1, at 7). That Opinion & Order explained that Plaintiffs were "challenging a search warrant authorized by the 12th District Court and executed in mid-January 2010." (*Id.* at 1). It stated that Plaintiffs (the petitioners there) were not challenging the seizure of records and documents, but rather, challenged "the seizure of the financial assets including the accounts at National City Bank, Citizens Bank, and Pension Consultants, Inc., and the seizure of any money and checks at the home and office of the doctor." (*Id.*). It noted that "Dr. Sampson, his wife, and his business have not been charged with any crime," and that no forfeiture action had been commenced against them either. (*Id.*). It noted that the challenged warrant authorized the taking of all funds in the bank accounts of the Plaintiffs, the entire pension fund, and any money or checks at the business or home of Dr. Sampson and that the "search warrant does not limit the amount of money which can be taken." (*Id.* at 2). Judge Schmucker stated, in pertinent part:

> I have reviewed the affidavits. I am convinced they establish probable cause for
> intentional over-billing of substantial amounts and establish a substantial health
> care fraud. The affidavits clearly support a search for and a seizure of billing,
> financial and medical records.
> . . . .
> The Affidavit does not establish how either the bank accounts or the Pension Plan
> are involved in the medical billing fraud. The affidavit merely describes the fraud

14

and states these accounts exist.

. . . .

The basis for the search warrant is primarily, if not exclusively, the result of Blue Cross/Blue Shield's investigation.  They presented the State Police with a 3 inch binder that was read, but from the record, it does not appear that any additional independent investigation was conducted by the State Police.

. . . .

This warrant allows the taking of money which is clearly unrelated to Blue Cross billings.

. . . .

In summary, these assets do not fall within MCL 880.655, which describes the property that can be seized with a warrant.  The Affidavit for this search warrant does not establish probable cause that they fall into any of the listed categories.

(*Id*. at 2-4).  The Opinion & Order further rejected the prosecution's argument that the property was subject to forfeiture under RICO, explaining that the process under the relied upon forfeiture provision "is conviction, order of forfeiture and then seizure.  Nothing in [the relied upon statute] suggests a seizure can occur before conviction, much less before someone has been charged."

(*Id*. at 5).

Judge Schmucker's Opinion & Order concluded by stating, in pertinent part, that:

These search warrants do not establish probable cause for seizure of the bank accounts, cash, checks, or pension plans.  These items are not included within the listed property that can be seized in MCL 780.652.  As such, the search warrant is overbroad.  Even though there is evidence of a crime, it will not allow the seizure of these items at this time.

. . . .

The Affidavit for a search warrant establishes a substantial fraud.  I acknowledge that the amount of money is large, even for a high-earning medical doctor.  I am not suggesting the money cannot be subject to civil forfeiture procedure or that access to the money somehow cannot be restricted by conditions of bond.  But, I find that the seizure was unlawful in this case and I am reversing the District Court and ordering these items released and returned.

THIS IS A FINAL ORDER.

(*Id*. at 7).

15

> **4.      Plaintiffs Are Then Charged Criminally In Jackson County Circuit Court**

Plaintiffs' Second Amended Complaint states that "[o]n April 7, 2010, Dr. Sampson and Mrs. Sampson were criminally charged with 20 counts of making false claims and one count of conspiracy under the Health Care False Claims Act." (Sec. Am. Compl. at ¶ 58). Charges were also filed against Argyle. (*Id*. at ¶ 68).

> **5.      Meanwhile, BCBS Files A Civil Action Against the Sampsons In Jackson County Circuit Court**

Meanwhile, in April of 2010, BCBS initiated a civil action against Dr. Sampson and Argyle in Jackson County Circuit Court. (*See* Docket Entry No. 26-6, and Sec. Am. Compl. at ¶ 59, alleging that "On April 12, 2010, BSBSM filed a civil complaint against Dr. Sampson and Argyle alleging various claims for overpayment.").

Plaintiffs allege that on April 20, 2010, BCBS filed a motion for preliminary injunction "to prevent the return of the monies that had been illegally seized as required by the April 1, 2010 Order" and that the "motion relied upon the information which Castelein wrongfully obtained during the execution of the warrant (i.e., that Dr. Sampson was Jamaican and therefore might abscond with the monies." (Sec. Am. Compl. at ¶ 61). "At hearing held on April 27, 2010, BCBSM argued that the illegally seized monies were restitution for sums owed to BSBSM and should not be released to Dr. Sampson because he was Jamaican." (Sec. Am. Compl. at ¶ 64; *see also* Castelein Affidavit, Docket Entry No. 26-6 at ¶ 3, wherein he states that he attended the execution of the search warrants on January 19, 2010, and during that time, observed Dr. Sampson's most recent tax return identified him as a citizen of Jamaica, a passport identifying him as a Jamaican citizen, documents that show he owns real property in Jamaica, and

documents showing he owns various financial accounts in Antigua and Jamaica.).

"Judge Schmucker denied the Motion for Preliminary Injunction, and the monies were finally released with a check dated on or around May 7, 2010." (Sec. Am. Compl. at ¶ 65). "Thereafter, BSBSM amended its Complaint to include Mrs. Sampson as a Defendant in the civil action." (Sec. Am. Compl. at ¶ 66).

Plaintiffs allege that "[f]ollowing Defendants' Motion for Summary Disposition which was granted in part and denied in part, the parties agreed to stay the civil action until the conclusion of the criminal matter." (Sec. Am. Compl. at ¶ 67).

**6.     Plaintiffs File This Action While The Criminal Case Was Still Pending, But Before The Circuit Court Ruled On A Motion to Suppress**.

In connection with the criminal cases against them, the Sampsons filed a Motion to Suppress Evidence, with the circuit court judge presiding over the criminal cases, the Honorable Thomas D. Wilson.  (Docket Entry No. 28-2, Copy of 4/10/13 Opinion And Order).  That Opinion & Order states that, with respect to the Motion to Suppress, the court "held an evidentiary hearing on February 22, 2012, through February 23, 2012." (*Id*. at 2).

While the criminal actions were still pending in Jackson County Circuit Court, Plaintiffs initiated this action on January 11, 2013, by filing their original complaint.  At that time, Judge Wilson had not yet issued a ruling as to the Motion to Suppress.

Judge Wilson did not issue a ruling on the Motion to Suppress until April 10, 2013, when he issued a written Opinion & Order denying the motion.

**7.     Circuit Court Decision Denying Motion to Suppress In Criminal Case**

On April 10, 2013, Judge Wilson issued an "Opinion And Order Following Defendants'

17

Motion To Suppress Evidence" that states, in pertinent part:

> Defendants seek to exclude evidence gleaned from the civilian-assisted execution of three police search warrants on January 19, 2010 . . . Defendants claim that civilian participation is not authorized under Michigan law and, in this case, violated the parameters tolerated by the 4th Amendment. In response, the People contend that civilian participation is permissible and the executions lawful because neither the officers nor the recruited civilians exceeded the scope of the warrants.
>
> . . . .
>
> The first issue before the Court is whether the participation of civilians in the execution of a search warrant, an interrogation, or drafting of a police report is *per se* illegal under Michigan law. Unlike federal law, there is no explicit statute authorizing law enforcement to use civilian assistance . . . [and] Defendants have not provided any Michigan legal authority precluding the use of civilians in the execution of search warrants . . . Without a particular state law to violate, the Court must review the legality of the searches in light of the Fourth Amendment. Although the state may grant more protections against governmental intrusions than the US Constitution, it may not grant less. So, in order to pass constitutional muster on both state and federal levels, the searches must comply with the 4th Amendment.
>
> Civilian participation in the execution of a search warrant does not automatically violate the 4th Amendment.
>
> . . . .
>
> The Sixth Circuit has interpreted civilian assistance in the execution of police searches to be reasonable when (1) the civilians were present on the premises in aid of officers authorized to conduct the particular search, (2) the officers requested the presence of the civilians, and (3( the officers were present and acting in execution of the warrant. *United States v. Clouston*, 623 F2d 485, 486-87 (CA 6 1980). . . Most recently, the Sixth Circuit affirmatively restated the rule from *Bills* in *Stack v. Killian*, 96 F3d 159, 162 FN1 (CA 6 1996): "Police may constitutionally call upon private citizens to assist them, and where assistance is rendered in aid of a warrant, and not for some other purpose, the bounds of reasonableness have not been overstepped."
>
> Here, the Court does not find that the bounds of reasonableness have been overstepped. Blue Cross Blue Shield employees were present during the searches to aid the officers in identifying medical documents. The officers were authorized to search the three locations pursuant to three valid search warrants. The officers requested the assistance of Blue Cross Blue Shield, and officers, although outnumbered, were present on each of the premises and searching concurrently with Blue Cross Blue Shield employees. Unlike *Clouston*, nothing was seized by Blue Cross Blue Shield employee that was not authorized by Detective-Sergeant Gee-Cram. Further, Detective-Sergeant Gee-Cram did not authorize the seizure

of any item that was beyond the scope of the warrant. Despite Blue Cross Blue Shield's latter use of information gained through the searches, at the time of the search, all evidence pursued and gathered benefitted the purposes of law enforcement. Because the assistance of Blue Cross Blue Shield employees furthered the authorized goals of the law enforcement investigation, the Court finds that the citizen participation in this case was reasonable and lawful.

Applying the same test, the Court also finds that Blue Cross Blue Shield employees' participation in the interviewing and summary drafts is also reasonable under the 4th Amendment. The civilians were present at law enforcement's request to assist the police with questioning. Even though some of the civilians asked nearly all the questions, the police were present during the entire interview and retained control. The Court is not concerned that a Blue Cross Blue Shield employee drafted a report rather than an officer submitted as his police report because he was present during the interview and takes responsibility for its content. Nor is the reasonableness of the interviews undermined by Blue Cross Blue Shield's private use of information gained from the participation as agents of the law enforcement in government searches because the information was originally obtained to further a [sic] legitimate law enforcement purposes. Although Blue Cross Blue Shield's misuse of the information subsequent to the searches exposes them to civil litigation, it does not render a valid search unreasonable. Therefore,

IT IS HEREBY ORDERED that Defendants' Motion to Suppress is DENIED.

(*Id*.).

### 8.    A Plea Agreement Is Reached In The Criminal Case On May 8, 2013.

All criminal charges against Dr. and Mrs. Sampson were ultimately dropped as part of a plea agreement reached on May 8, 2013. Argyle entered into a plea agreement under which: 1) Argyle agreed to plead no contest to an added count of using false pretenses with intent to defraud between $1,000 and $20,000, in violation of Mich. Comp. Laws § 750.218(4)(a); 2) the existing criminal charges against Dr. and Mrs. Sampson would be dismissed; and 3) the "state civil action by Defendants to be dismissed to County and state agencies and personnel." That plea agreement resolved all criminal charges against Plaintiffs and there are no criminal charges

pending.

## ANALYSIS

There are three different summary judgment motions pending.  Because the challenges

are so similar, the Court will address them by count challenged.

**A.      Challenges To Count I:  § 1983 Claim Based On Seizure Of Monies Without
Probable Cause**

Count I, brought pursuant to § 1983, alleges that Defendants Cram and Rose violated

Plaintiffs' Constitutional rights by seizing monies without probable cause.  This Count has

already been dismissed at to Defendant Cram.  (*See* 9/16/14 Opinion & Order at 23-27).

Defendant Rose, from Jackson County, now seeks dismissal of this Count as to him on

the same basis as Defendant Cram.

This Court reaches the same conclusion as to Defendant Rose that it reached when this

Count was challenged by Defendant Cram – that this officer is entitled to qualified immunity as

to Count I:

> The first step is to determine if Count I of the Amended Complaint alleges
> a constitutional violation as to Cram.
> Where a plaintiff alleges that he was subject to an unreasonable search or
> seizure because a warrant that was actually issued by a judge or magistrate was
> not truly supported by probable cause, the standard that applies is set forth in
> *Messerschmidt.  Messerschmidt v. Millender*, 132 S.Ct. 1235 (2012).
> Like the plaintiff in *Messerschmidt,* Plaintiffs allege they were subjected to
> unreasonable search and seizure of the funds at issue in violation of the Fourth
> Amendment because the warrants authorizing the seizure of the funds were not
> actually supported by probable cause.  The officers in this case, like the officers in
> *Messerschmidt*, assert that they are entitled to qualified immunity as to these
> claims.  Thus, as in *Messerschmidt*, the validity of the financial warrants is not
> before the Court, but rather, the question is whether [the officers] are "entitled to
> immunity from damages, even assuming that the warrant[s] should not have been
> issued."  *Messerschmidt,* 132 S.Ct. at 1244.
> "Qualified immunity 'gives government officials breathing room to make

reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt, supra*, at 1244.

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt, supra*, at 1245. Nevertheless, "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Id*. The Supreme Court has "recognized an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" *Messerschmidt, supra*, at 1245 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, (1986)). "The 'shield of immunity' otherwise conferred by the warrant" "will be lost, for example, where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Messerschmidt, supra*, at 1245 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). That is, the magistrate who signed the warrant must have "so obviously erred that any reasonable officer would have recognized the error." *Id*. at 1250.

The Supreme Court noted that "the *threshold for establishing this exception is a high one, and it should be." Messerschmidt, supra*, at 1245 (emphasis added). The Court explained that the "occasions on which this standard will be met may be rare, but so too are the circumstances in which it will be appropriate to impose personal liability on a lay officer in the face of judicial approval of his actions." *Id*. at 1250. The Court further explained:

> As we explained in *Leon*, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination' because "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Id*., at 921, 104 S.Ct. 3405; *see also Malley, supra*, at 346, n.9, 106 S.Ct. 1092 ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable" (internal quotation marks and citation omitted)).

*Id.* at 1245.

The district court denied qualified immunity to the officer in *Messerschmidt* and relied on *Groh v. Ramirez,* 540 U.S. 551 (2004). In reversing,

the Supreme Court found that precedent "is far afield," explaining:

> There, we held that officers who carried out a warrant-approved search were not entitled to qualified immunity because the warrant in question failed to describe the items to be seized at all. *Id.*, at 557, 124 S.Ct. 1284. We explained that "[i]n the portion of the form that called for a description of the 'person or property' to be seized, [the applicant] typed a description of [the target's] two-story blue house rather than the alleged stockpile of firearms." *Id.*, at 554, 124 S.Ct. 1284. Thus, the warrant stated non-sensically that "'there is now concealed [on the specified premises] a certain person or property, name [a] single dwelling residence two story in height which is blue in color and had two additions attached to the east.'" *Id.*, at 554-555, n.2, 124 S.Ct. 1284 (bracketed material in original). Because 'even a cursory reading of the warrant in [that] case – perhaps just a simple glance – would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal," *id.*, at 564, 124 S.Ct. 1284, we held that the officer was not entitled to qualified immunity.
>
> The instant case is not remotely similar. In contrast to *Groh*, any defect here would not have been obvious from the face of the warrant. Rather, any arguable defect would have become apparent only upon a close parsing of the warrant application, and a comparison of the affidavit to the terms of the warrant to determine whether the affidavit established probable cause to search for all the items listed in the warrant. This is not an error that "just a simple glance" would have revealed.

*Messerschmidt,* 132 S.Ct. at 1250.

Thus, the question here is whether it would have been obvious that no reasonably competent officer would have concluded that the financial warrants should not have issued. This Court concludes that this is not one of those exceedingly rare cases where that very high standard is met. Like the warrant at issue in *Messerschmidt,* the defect is not an error that "just a simple glance" at the warrant would have revealed. Rather, the defect with the warrant ultimately found by Judge Schmucker would have only become apparent upon a careful and detailed legal analysis, looking at the warrant, the affidavit, and the relevant statute.

(9/16/14 Opinion & Order at 24-27). Accordingly, Defendant Rose is entitled to qualified immunity as to Count I.

**B.      Challenges To Count II:  § 1983 Claim Based On Seizure Of LLC Funds**

Count II of Plaintiffs' Second Amended Complaint, brought under § 1983, asserts that there was no warrant authorizing the seizure of assets of Fourth Street Properties but that funds were improperly seized from it nonetheless in violation of Plaintiffs' rights.  More specifically, Count II challenges as unconstitutional the execution of a search warrant at Citizens Bank by Detective Rose and Detective Cram.  (Sec. Am. Compl. at 14).  Plaintiffs allege that the search warrant specifically permitted seizure of accounts belonging to Argyle, Dr. Sampson, and Trillium" but there "was no warrant allowing seizure of accounts and assets belonging to" Fourth Street Properties.  (*Id*. at 14-15).  Plaintiffs allege that Rose and Cram "seized $32,836.12 from a savings account and $10,086.08 from a money market account belonging" to Fourth Street Properties.  (*Id*.).

Defendants Cram and Rose now seek dismissal of this Count, asserting that they are entitled to qualified immunity.

To state a claim under § 1983, a plaintiff must set forth facts that, when construed favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the United States; 2) caused by a person acting under the color of state law.  *Dominguez v. Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009).

Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Id.; Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008).  Determining whether government officials are entitled to qualified immunity generally requires

23

two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation. *Dominguez*, 555 F.3d at 549.

Count II is asserted against two individual officers, Cram and Rose. "Each defendant's liability must be assessed individually based on his [or her] own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).   As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the challenged action, will not subject an officer to liability. *Id.*

### 1.    Viewing The Facts In The Light Most Favorable To Plaintiffs, Have They Established A Constitutional Violation As To Either Cram Or Rose?

The first step in the qualified immunity analysis is to consider whether, viewing the facts in the light most favorable to Plaintiffs, could Plaintiffs establish a Constitutional violation with respect to either of the two officers.

Again, Count II alleges a Constitutional violation based upon the seizure of funds that belonged to Fourth Street Properties.  The claim asserts that although the warrant authorized the seizure of certain accounts, other accounts were also improperly seized.  Thus, the claim is based on *the manner in which the search warrant was executed at the bank*, rather than asserting that there was no probable cause for the warrant to be issued in the first place as is alleged in Count I.

Plaintiffs' Second Amended Complaint alleges that Defendants Rose and Cram executed the search warrant at Citizens Bank.

All evidence presented in connection with the pending motions, however, reflects that while Cram obtained the search warrant, she did not go to Citizens Bank to execute it.  Rather,

24

Defendant Rose and non-party Shaw actually went to Citizens Bank and executed the search warrant.  At the January 15, 2015 hearing, Counsel for Plaintiffs conceded that Plaintiffs have no basis to dispute that Cram was not actually present at the bank when the search warrant was executed.  Given that, this Court fails  to see how Plaintiffs could have a claim against Cram based on the execution of the search warrant at Citizens Bank.

As to Defendant Rose, it is undisputed that he went to Citizens Bank to execute the search warrant.

The search warrant at issue (Docket Entry No. 76-2) described the place or thing to be searched as Citizens Bank, accounts "in the name of Argyle Plastic & Reconstructive Surgery PC, Dr. John Sampson, MD, or Trillium Cosmetic Surgery Center."   That search warrant described the property to be seized, if found, as the "assets of any and all accounts related to the above requested business(s) are to be seized and turned over to the Michigan State Police at the time of execution of this search warrant and the account is to be frozen against further withdrawals.  Any funds that are deposited into the above account(s) after the time of the seizure are to be frozen until further order of this honorable court."  (*Id.*).

Because the search warrant at issue called for the seizure of bank accounts, the two officers who executed it (Rose and Shaw) played a fundamentally different role than officers who execute a search warrant at a home, office, or other kind of business.  When executing a search warrant at a home or typical office, the officers actually enter that physical space themselves and search for items that the warrant authorizes them to seize (ie., they are looking through rooms, drawers, etc. and then make the determination as to whether items they find match the description of the items in the warrant that they are authorized to seize).  As Rose's report and

Cram's Affidavit reflect, however, this involved an entirely different situation because the search warrant at issue authorized the seizure of funds from bank accounts.  As Plaintiffs' Counsel conceded at the hearing, the two officers who executed the search warrant at the bank simply presented the search warrant to bank officers and then the bank officers determined which funds would be seized and turned over to the officers.  In other words, the bank's own personnel, rather than the officers, played the key role in determining the funds that were authorized to be seized.

Given the officers' very limited roles in the execution of the search warrant at Citizens Bank, the Court fails to see how they can be said to have violated Plaintiffs' Constitutional rights.

### 2.      Was The Constitutional Right "Clearly Established" In January Of 2010?

Moreover, even if Plaintiffs' could establish that the conduct of Rose or Cram in executing the search warrant at Citizens Bank violated their constitutional rights, Plaintiffs would also have to meet the clearly established prong of the qualified immunity test.

Defendant Cram asserts that Plaintiffs cannot meet this prong of the qualified immunity test, asserting that law enforcement delivered a valid search warrant to Citizens Bank, the "bank read the warrant and identified all accounts falling under the plain terms of the warrant.  D/Sgt Gee-Cam played no role in that process and instead reasonably relied upon the bank's court-ordered cooperation.  For purposes of the Fourth Amendment, there is no clearly established law" that would have advised either of the officers to do anything different.  (Def. Cram's Br. at 3).

The Court agrees that Plaintiffs cannot meet this second prong of the test with respect to Count II of their Second Amended Complaint.

Under the "clearly established" inquiry, the question is whether the right was so clearly

26

established that a reasonable official would understand that what he or she is doing violates the law. *Jones v. Byrnes*, 585 F.3d at 975. "The essential inquiry is whether the defendant had fair warning that his [or her] actions were unconstitutional." *Hensley v. Gassman*, 693 F.3d 681, 693–94 (6th Cir.2012). This inquiry must be undertaken in the consideration of the specific context of the case, not as a broad proposition. *Jones,* 585 F.3d at 975.

In addition, this inquiry is "assessed in light of the legal rules that were 'clearly established' at the time" of the conduct at issue. *Messerschmidt.*, —— U.S. ——, ——, 132 S.Ct. 1235, 1245, 182 L.Ed.2d 47. Accordingly, the Court must consider the state of the law in January of 2010, when the seizures of Fourth Street Properties' funds occurred. Accordingly, even if Defendants' conduct violated Plaintiff's rights, Plaintiff has to show that the rights Defendants violated were clearly established at the time of alleged misconduct such that a reasonable officer could not have believed that his conduct was lawful.

In order to make such a showing, Plaintiffs need to direct the Court to a case wherein a similar legal and factual scenario as that presented here was found to have resulted in a constitutional violation. *Bray, supra*. In other words, there must have been a case wherein an officer executing a search warrant at a bank or another similar institution relied on the bank's personnel in determining which accounts and funds at the bank should be seized under the terms of the search warrant and was nevertheless found to have violated the account owner's constitutional rights.

Plaintiffs have identified no such case and this Court has been unable to locate such a case.   As such, the Court rules that both Cram and Rose are entitled to qualified immunity with respect to Count II.

**C.     There Are No Challenges As To Counts III Or IV To Be Considered In Connection With The Pending Motions**

Counts III and IV, which are both conspiracy claims brought under § 1983, were previously dismissed as to Defendant Cram.

In their Motion for Summary Judgment, the Jackson County Defendants assert that they are entitled to dismissal as to Plaintiffs' conspiracy claims.  (*See* Docket Entry No. 73 at 16).  But, as Plaintiffs acknowledge in their response, those counts have not been asserted against the Jackson County Defendants.  (*See* Pls.' Resp. Br. at 21) ("Plaintiffs have not named Jackson County Defendants as co-conspirators.).

**D.     Challenges To Count V:  § 1983 Claim Based Upon BCBS Participation In Execution Of Search Warrant**

Defendants Schlundt and Russell (from Jackson County), and Defendant Schrock (from Blackman Township) now challenge this Count.  It was previously dismissed as to Defendants Cram and Gettel because they are entitled to qualified immunity as to Count V because, even if Plaintiffs could establish a Constitutional violation as to the officers using BCBS employees to assist in the search, Plaintiffs cannot show that the rights were clearly established at the time of the alleged misconduct.  (*See* 9/16/14 Opinion & Order at 19-23).  Indeed, given a recent Sixth Circuit case that this Court directed the parties to, Plaintiffs conceded, as to Defendants Cram and Gettel, they were entitled to qualified immunity as to Count V.  (*Id*. at 22).

Defendants  Schlundt and Russell (from Jackson County), and Defendant Schrock (from Blackman Township), now each assert that they are entitled to qualified immunity.

28

1.       **Viewing The Facts In The Light Most Favorable To Plaintiffs, Have They Established A Constitutional Violation As To Any Of These Three Officers?**

The first step in the qualified immunity analysis is to consider whether, viewing the facts in the light most favorable to Plaintiff, could Plaintiff establish a Constitutional violation with respect to either of these three officers (Schlundt, Russell, and Schrock).

Again, "[e]ach defendant's liability must be assessed individually based on his [or her] own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).  As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the challenged action, will not subject an officer to liability.  *Id.*; *Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984); *see also Gordon v. Louisville/Jefferson Cty. Metro. Govt.*, 486 F. App'x. 534, 541 (6th Cir. 2012) (An officer who is present at a scene of a § 1983 violation but is not directly responsible for the complained action is entitled to qualified immunity.).

It is undisputed that Defendant Cram was the lead officer in the investigation involving Plaintiffs.  Defendant Cram obtained the search warrants and signed the search warrant affidavits.  While there are numerous allegations as to actions taken by Cram, Plaintiffs' Second Amended Complaint contains scant allegations as to Defendants Schlundt, Russell, and Schrock.

Plaintiffs allege that Defendant Cram requested participation of the Jackson County Major Crimes Task Force and that those participants included Schrock, Schlundt, Rose, Russell, and Gettel.  (Sec. Am. Compl. at ¶ 41, 124 & 126).  Plaintiffs also allege that unidentified "Ingham County law enforcement officers" were at the searches at issue.  (*Id.* at 42).

Plaintiffs allege that the "participation of BCBSM personnel was an unauthorized invasion of privacy of Dr. Sampson, Mrs. Sampson, Argyle and Trillium."  (*Id.* at ¶ 131).

29

Notably, Plaintiffs allege that *Defendant Cram alone* invited Castelein to put together a BCMSM team to participate in the execution of the warrants. (Sec. Am. Compl. at ¶ 43 & ¶ 124). Plaintiffs further allege that "Castelein had sole responsibility for and discretion in choosing the number and expertise of the BCBSM team." (*Id*. at 127).

Plaintiffs allege that on January 19, 2010, during searches at Argyle and Trillium, Defendant Cram and other unspecified officers "allowed BCBSM personnel to exercise and exceed the authority granted to law enforcement officials in the search and seizure process." (*Id*. at ¶ 39-45). Plaintiffs further allege that Cram and other unspecified members of the Jackson County Major Crimes Tax Force, along with BCBS employees, performed another search at the Sampson residence. (*Id*. at 47-48).

Thus, while Plaintiffs allege the Defendant Cram invited BCBS employees to assist in executing the searches, and that Cram allowed them to take improper actions while doing so, they do not allege that Schlundt, Russell, or Schrock had any role in that conduct. The Court fails to see any allegations that could establish that Schlundt, Russell, or Schrock had any direct responsibility for the alleged misconduct alleged in Count V. Accordingly, the Court finds that, viewing the allegations in a light most favorable to Plaintiffs, they have not established a constitutional violation as to Schlundt, Russell, or Schrock.

**2.     Was The Constitutional Right "Clearly Established" In January Of 2010?**

Moreover, even if Plaintiffs could establish a constitutional violation as to any of these three officers, Plaintiffs cannot show that the constitutional right at issue was clearly established in January of 2010.

Again, as to Defendant Cram, Plaintiffs previously conceded that she was entitled to

qualified immunity because Plaintiffs cannot show that the rights at issue were clearly

established at the time of the alleged misconduct.  (*See* 9/16/14 Opinion & Order at 19-23).

    In responding to the current motions, however, Plaintiffs do not concede that the officers

are entitled to qualified immunity.  Nevertheless, in light of *Bray v. Planned Parenthood*

*Columbia-Williamette, Inc.,* __ F.3d __, 2014 WL 1099108 (6th Cir. March 21, 2014)*,* the Court

shall  rule, consistent with its prior Opinion & Order, that these officers are also entitled to

qualified immunity as to Count V.  As this Court previously explained:

> In *Bray*, Planned Parenthood Columbia Willamette, Inc. ("PPCW")
> obtained a money judgment against Michael Bray, an antiabortion activist.  PPCW
> sought to enforce and collect on the judgment and a district court issued a writ of
> execution authorizing the U.S. Marshals Service to seize various property.  A
> separate order issued the same day stated that "[i]f requested, by the United States
> Marshal's Service, a representative from [PPCW] shall be present to assist in the
> identification of property subject to seizure."  *Id*. at *3.  When the writ was
> executed at Bray's home, numerous individuals from PPCW accompanied the
> marshals and one of them videotaped the inside of Bray's home.  Bray filed suit
> against the marshals who executed the writ and order and the district court
> dismissed the action, ruling that the marshals were protected by qualified
> immunity.
>     The Sixth Circuit affirmed.  Notably, the Sixth Circuit found that the
> marshals' alleged actions in executing the writ were unreasonable and that they
> violated Bray's rights under the Fourth Amendment.  *Id*. at *7.  Indeed, the Sixth
> Circuit was quite critical of the facts alleged concerning the search.  *Id.* at * 1 ("If
> the facts alleged in the complaint are true, this case involves an incident that is
> more like home raids by Red Guards during China's Cultural Revolution than like
> what we should expect in the United States of America.").  Nevertheless, the
> Sixth Circuit held that the marshals "are protected from suit by the doctrine of
> qualified immunity, because these constitutional rights were not clearly
> established at the time of the violations."  *Id*. at *8.  In so ruling, the court
> explained that a "right is clearly established if 'every reasonable officer would
> have understood that what he [was] doing violate[d] that right,' and 'existing
> precedent . . . placed the statutory or constitutional question beyond debate.'" *Id.*
> (quoting *Reichele v. Howards*, __ U.S. __, __ 132 S.Ct. 2088, 2093 (2013)).
>     The Sixth Circuit found that Defendants violated the plaintiffs' Fourth
> Amendment rights by having multiple unauthorized PPCW representatives
> participate during the execution of search warrants.  The court found, however,

that the marshals might have "reasonably believed that it was acceptable to invite additional representatives of PPCW to join the raid, because outside involvement in the execution of a court order is sometimes permissible.  For example, in *United States v. Clouston*, 623 F.2d 485, 486-87 (6th Cir. 1980), this circuit approved assistance by a telephone company's employees in the execution of warrant related to wiretapping, partly because the employees were present to aid in the identification of electronic devices covered by the warrant."  *Bray, supra*, at *8.  The court further explained:

> Although here the writ of execution identified the number of PPCW representatives who were authorized to be present, a marshal might nonetheless have concluded that it was permissible to invite additional representatives of PPCW to execute the writ, because officers may sometimes seek the aid of third parties in executing court orders.  Further buttressing this conclusion, the marshals' actions in seeking outside assistance were distinct from those in which this circuit has recognized a possible constitutional violation.  For example, the marshals did not invite private individuals to join them *after* they had already completed a search authorized by a warrant, as occurred in *Bills v. Aseltine*, 958 F.2d 697, 702 (6th Cir. 1992).

*Id*. (emphasis in original).

The Court also concluded that "[a]n officer who was unaware that the additional representatives of PPCW were not authorized to be present might also have reasonably concluded that the individuals could film the home," given that other circuits have assumed without deciding that videotaping the execution of a valid search warrant is lawful.  *Id*. The court concluded that:

> Although here the cameraman was not authorized to be present in the Brays' home, reasonable officers who were mistaken about the lawfulness of inviting additional representatives of PPCW to join the raid might likewise have been mistaken about whether those representatives could film the home, particularly in light of the camera's utility in capturing the condition of the property prior to its sale.  Therefore, the rights the marshals breached were not clearly established at the time of the violations.

*Id.* at *9.

Here, there was no videotaping alleged and there is no allegation that BCBS representatives were brought in after the search was over.  Rather, Plaintiffs allege Defendants

32

violated their Fourth Amendment rights by having BCBS representatives participate during the execution of the search warrants.  Even if that conduct violated Plaintiffs' constitutional rights, Plaintiffs have to show that the rights Defendants violated were clearly established at the time of alleged misconduct such that a reasonable officer could not have believed that his or her conduct was lawful.  And in light of *Bray*, Plaintiffs cannot, and have not, made that showing.

Accordingly, the Court shall grant summary judgment to Defendants Schlundt and Russell (from Jackson County), and Defendant Schrock (from Blackman Township) as to this count, because they are entitled to qualified immunity.

**E.    Challenges To Count VI: Plaintiffs' Count That Asserts Municipal Liability**

Count VI seeks to impose municipal liability against Jackson County and Blackman Township, both under a failure-to-train theory, for the alleged Constitutional violations committed by the Blackman Township and Jackson County officers.

Given that this Court is dismissing all claims against the individual officers, then Plaintiffs cannot rely on their conduct to establish a claim of municipal liability against Blackman Township or Jackson County and Count VI must be dismissed.  *See, e.g., Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendant is established, the municipal defendants cannot be held liable under § 1983."); *Snyder v. United States,* __ F. App'x. __, 2014 WL 5437999 at *8 (6th Cir. Oct. 28, 2014) ("once qualified immunity has been established for the individual defendant, the municipality is also immune from suit.").

Accordingly, the Court shall dismiss Count VI as to both Jackson County and Blackman

33

Township.

## CONCLUSION & ORDER

For the reasons set forth above, **IT IS ORDERED** that the pending summary judgment

motions filed by Defendant Cram, the Jackson County Defendants, and the Blackman Township

Defendants are **GRANTED.**

**IT IS SO ORDERED.**

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  January 26, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on
January 26, 2015, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

34